FILED _____ ENTERED
LODGED _____ RECEIVED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

OCT 3 1 2014

AT GREENBELT
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND

BY _____ DEPUTY

IN THE MATTER OF THE TARGET          )
cellular telephone with the number     )
(301) 768-0340, subscribed to          )      CRIM NO.  14-2184 CBD
Gerald L. Moschel and currently        )
being serviced by T-Mobile             )
                                        )
                                        )

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Shonn A. Dyer-Jones, being first duly sworn, hereby depose and state the following:

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of

Criminal Procedure for a search warrant authorizing the examination of property, a certain

electronic device, further described in Attachment A and the extraction from that device of

electronically stored information described in Attachment B.

2. Based on the below described investigation, your affiant submits there is probable cause to

believe that (1) SESAY is involved in a scheme to fraudulently obtain and use credit and debit

card information belonging to others for pecuniary gain in violation of 18 U.S.C. § 1028 (fraud

and related activity in connection with identification documents, authentication features, and

information), 18 U.S.C. § 1029 (fraud and related activity in connection with access devices), and

18 U.S.C § 1343 (fraud by wire, radio, or television) and (2) that the TARGET TELEPHONE

contains evidence and the fruits and instrumentalities of those violations.

## AFFIANT'S BACKGROUND AND KNOWLEDGE

3. I am a Special Agent with the Defense Criminal Investigative Service (DCIS) assigned to

the Cyber Crimes Division East.  I have been a Special Agent with DCIS since August 2012.  As

a DCIS Special Agent, I am responsible for investigating violations of Federal criminal law.

1



Specifically, I invesigate allegations and matters related to computer crimes and fraud, waste, and abuse. I have received specialized training in this area.

4. Prior to DCIS, I was a Special Agent with the Air Force Office of Special Investigations (AFOSI) from 2004 until 2012.

5. I graduated with a Bachelor's degree in Criminal Justice from Pennsylvania State University, a Masters degree in Criminal Justice from The George Washington University and a Masters degree in Business Administration from Northcentral University. I graduated from the Federal Law Enforcement Training Center (FLETC) in 2004, where I received training in how to conduct complex criminal investigations, and trained in federal search and seizure procedures. I have since participated in complex interstate criminal investigations with special agents and investigators from other Federal and state law enforcement agencies. During these investigations, I also participated in the execution of search warrants to seize evidence of crime.

6. The facts set forth in this affidavit are based on my personal knowledge, knowledge obtained during my participation in this investigation, knowledge obtained from other individuals, including other law enforcement personnel, and records obtained related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through training and experience. This affidavit sets forth only the facts necessary to establish probable cause to search for evidence and/or instrumentalities of these crimes and does not set forth every fact learned in this investigation.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

7. The electronic device to be examined is further described in Attachment A. It is described as cellular telephone with a telephone number of (301) 768-0340, subscribed to Gerald L. Moschel and currently being serviced by T-Mobile ("the TARGET TELEPHONE"). At this time,



your affiant believes ISHMEL SESAY is in possession of the TARGET TELEPHONE.  As such, your affiant also seeks authorization to seize the TARGET TELEPHONE from the person of ISHMEL SESAY.

8.  The applied for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## INVESTIGATION

9. In February 2014, AAFES Loss Prevention informed DCIS that a female contacted the Army and Air Force Exchange Service (AAFES) Base Exchange store located on Fort Belvoir, VA, and advised her credit card had been used to make a purchase at the store without her authorization.  AAFES is an organization that delivers merchandise and services to the military community at competitively low prices.[1]  AAFES Loss Prevention obtained video surveillance footage and AAFES transaction history from the incident.  The video surveillance reveals that a black male made the unauthorized purchases.  According to AAFES transaction records, the black male used a gift card to conduct the transaction.

10. AAFES Loss Prevention then conducted a database query to find all credit card numbers used to purchase gift cards ranging between $100 to $500 from Base Exchange stores in the Washington, D.C. area.  After obtaining the transaction histories, AAFES Loss Prevention obtained the corresponding video surveillance footage for each transaction.  Upon reviewing the surveillance footage, AAFES Loss Prevention observed the same black male making additional purchases.  According to the transaction history, AAFES Loss Prevention determined the unknown black male used multiple credit cards to make these purchases.

---

[1] AAFES has more than 3,100 locations worldwide, including stores at Fort Belvoir, VA, Fort Meade, MD, Fort Meyers, VA, Joint Base Andrews (JBA), MD; and Joint Base Anacostia-Bolling (JBAB), Washington, D.C.



11. On March 13, 2014, based on video surveillance and AAFES transaction records, AAFES Loss Prevention discovered a black male made a purchase of an Apple iPad Mini at the Base Exchange store located on Fort Meade, MD. The total cost of the purchase was $661.99. Based on the video surveillance photographs, the black male appears to be the same black male described above. AAFES Loss Prevention also witnessed a second unknown black male in the surveillance footage making purchases with multiple credit cards with AKINBOLUSIRE. Based on AAFES policy, Apple iPads are considered critical items and any individual purchasing critical items are required to provide a name and photographic identification. According to AAFES' transaction records, the purchaser identified himself "OLUBODE AKINBOLUSIRE."

12. After obtaining this information, AAFES Loss Prevention conducted a Department of Defense (DoD) Personnel Search for "OLUBODE AKINBOLUSIRE." The search revealed AKINBOLUSIRE was a 1LT assigned to the 74th Troop Command, 2001 East Capitol Street, Washington, DC 20003. AAFES Loss Prevention also obtained a military photograph of AKINBOLUSIRE. AKINBOLUSIRE's photograph appears to match the black male who was observed, via video surveillance footage, making fraudulent purchases as in March and February 2014.

13. On August 23, 2014, based on video surveillance and AAFES transaction records, the second black male present with AKINBOLUSIRE, as described above, attempted to purchase two (2) Vanilla Visa gift cards at the Joint Base Andrews (JBA) Base Exchange (BX) Main Store. The transaction, however, was not successful, but he did successfully purchase $13.48 of goods using a Visa card ending in 9281.

4



a.  Using its video surveillance system, AAFES Loss Prevention zoomed in on the unknown black male and was able to determine he was using a military Common Access Card (CAC) in the name of "ISHMEL SESAY."

b.  At the same time and location, AKINBOLUSIRE purchased a PlayStation (PS) 4 Console for $399.95 using a Visa card ending in 8837.  AKINBOLUSIRE also purchased a Vanilla Visa gift card for $504.95 using a Visa card ending in 3488.

14. After identifying SESAY, AAFES Loss Prevention reviewed historical video surveillance footage and transaction records and determined that SESAY made the following purchases:

a.  On February 25, 2014, SESAY purchased two (2) $100 Vanilla Visa gift cards and other assorted items for $247.06 from the JBA Main Store using a Visa card ending in 0366. AKINBOLUSIRE was with SESAY and he (AKINBOLUSIRE) purchased one (1) Vanilla Visa gift card and assorted items for $384.90 from the JBA Main Store using a MasterCard ending in 2473.

b.  On April 15 2014, SESAY purchased two (2) $100 Vanilla Visa gift cards and other assorted items for $241.84 from the JBA Main Store using a MasterCard ending in 4696. Additionally, SESAY purchased two (2) $100 Vanilla Visa gift cards, two (2) suitcases for $139.98 and other assorted items for $351.88 using a MasterCard ending in 8198. AKINBOLUSIRE was with SESAY and he (AKINBOLUSIRE) purchased two (2) Vanilla Visa gift cards and other assorted items for $241.84 using a MasterCard ending in 4696.

c.  On June 12, 2014, SESAY purchased two (2) Vanilla Visa gift cards and other assorted items from the JBA Main Store for $282.49 using a Visa card ending in 1095.  SESAY made an additional purchase of two (2) Vanilla Visa gift cards and other assorted items from the JBA Westside Express for $247.33 using a Visa card ending in 8913.  AKINBOLUSIRE was

5



with SESAY during this transaction and he (AKINBOLUSIRE) purchased two (2) Vanilla Visa gift cards and other assorted items for $345.88 using a Visa card ending in 0985.

    d.  On August 20, 2014, SESAY purchased assorted items from the JBA Main Store for $69.99 using a Visa card ending in 0291, as well as two (2) Vanilla Visa gift cards and other assorted items for $317.85 using the same Visa card.  AKINBOLUSIRE was with SESAY during this transaction and he (AKINBOLUSIRE) purchased a PS4 console for $399.95 using a Visa card ending in 8837, and a Vanilla Visa gift card for $504.95 using a Visa card ending in 2065.

    e.  On August 21, 2014, SESAY purchased three (3) Vanilla Visa gift cards and other assorted items from the JBA Main Store for $394.73 using a MasterCard ending in 9115.  SESAY also purchased two (2) Vanilla Visa gift and other assorted items from the JBA Home & Garden Store for $286.89 using the same MasterCard.  AKINBOLUSIRE was with SESAY during these purchases and he (AKINBOLUSIRE) purchased a PS4 and a Vanilla Visa gift card from the JBA Main Store for $904.90 using a Visa card ending in 2065.  Additionally, he (AKINBOLUSIRE) purchased a $500 Vanilla Visa gift card and other assorted items from the JBA Westside Express for $508.63 using a Visa card ending in 8837.

    f.  On September 10, 2014, SESAY purchased a $400 Vanilla Visa gift card and other assorted items from the JBA Main Store for $421.95 using a Visa card ending in 9613.  SESAY also purchased a Legend Holiday gift set using the same Visa card.  AKINBOLUSIRE was with SESAY during these purchases and he (AKINBOLUSIRE) purchased two (2) Vanilla Visa gift cards for $227.89 using a Visa card ending in 9613.  This was the same card SESAY used.

15. On September 18, 2014, law enforcement officers executed a judicially authorized search warrant for AKINBOLUSIRE's residence and vehicles at 4748 Monterey Court, Waldorf, Maryland 20602, which resulted in the seizure of electronics, several Sony PS4 game consoles,



and kitchen appliances, all of which were identified by AAFES Loss Prevention as being purchased with stolen credit cards and fraudulently procured Vanilla Visa gift cards. In addition, law enforcement officers discovered approximately $17,000, in cash in the residence and a cellular phone found on the bed in AKINBOLUSIRE's bedroom.

16. A forensic analysis of AKINBOLUSIRE's cellular telephone revealed the following:

a. Text message communications with numerous unidentified individuals answering AKINBOLUSIRE's Craigslist advertisement regarding the purchase of Sony PS4's, for approximately $325, as well as PS4 games and accessories. According to the substance of the text messages, AKINBOLUSIRE met these individuals in various locations in the Washingon, D.C. area or shipped items to locations throughout the United States and received payment via PayPal.

b. A review of AKINBOLUSIRE's contact list showed telephone number 301-768-0340 was listed as "ISHMEL SESAY." The following text message communications took place between AKINBOLUSIRE and the TARGET TELEPHONE:

c. A text message dated July 10, 2014 from the TARGET TELEPHONE to AKINBOLUSIRE, which stated "Dude I need five plastic to buy." AKINBOLUSIRE replied "when." Based on my training, experience, and knowledge of this investigation, your affiant believes that "plastic," is a slang reference to credit and/or debit cards.

d. Text messages on June 11, 2014 between the TARGET TELEPHONE and AKINBOLUSIRE stating the following:

> **SESAY:** "Dude so u pick up ur shit already, damn son"
>
> **AKINBOLUSIRE:** "Yeah... I will tell you something he told me"



**SESAY:** "Dude thought I wasn't gonna give him his dough? Damn and that nigga ain't gave me a hint, and y d fuck would I wanna do that after he b looking out for us, anyway it's all good"

**AKINBOLUSIRE:** "Yeah... That's what I told him and that's why I keep letting you know to settle him.  Did you finally get it cause u were about to ass out?  I wasn't trying to share my shit either."

**SESAY:** "U stupid son, so u wanna hustle tomorrow"

**AKINBOLUSIRE:**  "I will let you know"

**SESAY:** "Aight fool, let me know tonight"

**AKINBOLUSIRE:** "K"

    e.  Based on my training, expereicence, and knowledge of this investigation, your affiant believes that SESAY and AKINBOLSIRE are working together in a fraud scheme ("hustle").

    f.  A text message on April 14, 2014 from the TARGET TELEPHONE to AKINBOLUSIRE, which stated the following: "Yo u got blanks." Based on my training, expereicence, and knowledge of this investigation, "blanks" is a reference to credit and/or debit cards that have not been encoded with specific access device numbers, such as a bank account number.

    g.  Text messages on August 12, 2014 between the TARGET TELEPHONE and AKINBOLUSIRE statingthe following:

**SESAY:** "Yo he only have 10 empties so w, ell divide it for tonight, we load the rest tomorrow"

**AKINBOLUSIRE:** "I have empties bro.  Yes."

8



17. Based on my training, expereicence, and knowledge of this investigation, your affiant believes that SESAY and AKINBOLSIRE are using "blank" or "empty credit and debit cards and encdoing the cards with fraudulently obtained access device numbers link to the credit and debit accounts of actual accounts. In addition, SESAY and AKINBOLSIRE have, or had access to, an electronic device, typically referred to as a "skimmer," that allows the user to alter the electronic information contained on credit and debit cards.



18. Based on the foregoing, your affiant submits that there is probable cause to believe SESAY and AKINBOLUSIRE conspired, via telephone and text message, to obtain fraudulent credit card numbers, fraudulently purchase items at AAFES locations throughout the Washington, D.C. area, and sell the fraudulently purchased goods using online based companies to generate revenue.

## TECHNICAL TERMS

19. Based on my training and experience, I use the following technical terms to convey the following meanings:

a.   Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and

9

playing back audio files; storing dates, appointments, and other information on personal
calendars; and accessing and downloading information from the Internet.  Wireless telephones
may also include global positioning system ("GPS") technology for determining the location of
the device.

b.   Digital camera:  A digital camera is a camera that records pictures as digital picture
files, rather than by using photographic film.  Digital cameras use a variety of fixed and
removable storage media to store their recorded images.  Images can usually be retrieved by
connecting the camera to a computer or by connecting the removable storage medium to a
separate reader.  Removable storage media include various types of flash memory cards or
miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.
This storage media can contain any digital data, including data unrelated to photographs or
videos.

c.   Portable media player:  A portable media player (or "MP3 Player" or iPod) is a
handheld digital storage device designed primarily to store and play audio, video, or photographic
files.  However, a portable media player can also store other digital data.  Some portable media
players can use removable storage media.  Removable storage media include various types of
flash memory cards or miniature hard drives.  This removable storage media can also store any
digital data.  Depending on the model, a portable media player may have the ability to store very
large amounts of electronic data and may offer additional features such as a calendar, contact list,
clock, or games.

d.   GPS:  A GPS navigation device uses the Global Positioning System to display its
current location.  It often contains records the locations where it has been.  Some GPS navigation
devices can give a user driving or walking directions to another location.  These devices can



contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.   IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

f.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

20. Based on my training, experience, and research, I know that Target Telephone, further described in Attachment A, has capabilities that allow it to serve some or all of the above-described functions or store information relevant to those functions. Additionally, examining data

11



stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

21. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

22. There is probable cause to believe that things that were once stored on the TARGET TELEPHONE may still be stored there, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence

12



can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

23. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.   Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to

13



investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

24. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

25. *Manner of execution.* Because your affiant believes that the TARGET TELEPHONE is currently in the possession of ISHMEL SESAY, your affiant seeks permission to seize the TARGET TELEPHONE from the person of SESAY.



## CONCLUSION

26. Based upon the foregoing information, there is probable cause to believe that the device described herein, there exist evidence, fruits, and instrumentalities of criminal offenses against the United States, to wit, for violations of U.S.C. Title 18 § 1028 (Fraud and related activity in connection with identification documents, authentication features, and information), § 1029 (Fraud and related activity in connection with access devices), and § 1343 (Fraud by wire, radio, or television). I declare under the penalty of perjury that the information provided above is true and correct.

Shonn A. Dyer-Jones
Special Agent
Defense Criminal Investigative Service


Subscribed and sworn to before me
This 31 day of September, 2014

Charles B. Day
United States Magistrate Judge

## ATTACHMENT A

### Property to Be Searched

The electronic device to be searched is a cellular telephone with the number (301) 768-

0340, subscribed to Gerald L. Moschel and currently being serviced by T-Mobile.

16



## ATTACHMENT B
### Particular Things to be Seized

1.  All records on the phones described in Attachment A that relate to violations of of 18 U.S.C. § 1028 (fraud and related activity in connection with identification documents, authentication features, and information), 18 U.S.C. § 1029 (fraud and related activity in connection with access devices), 18 U.S.C. § 1343 (wire fraud) and involved ISHMEL SESAY and any other co-conspirators, to include, but not limited to:

a.   All records and communications that relate to, further in any way, or constitute evidence of violations of the above listed statutes, including call records, text messages, pictures, video recordings, audio recordings, address book information, internet records, emails, notes, documents, and bookmarks;

b.   all records that have any tendency to establish the identity or location of co-conspirators;

c.   all records related to OLUBODE AKINBOLUSIRE's schedule or travel;

d.   all records related to the historical physical locations of the Device;

e.   all records related to financial transactions of any type, including credit card numbers, names, account numbers, routing numbers, amounts, dates, locations, addresses, receipts, communications, confirmations and any other identifying information;

f.   all access devices, as defined in 18 U.S.C. § 1029, all means of identification, as defined in 18 U.S.C. § 1028, and all related information including account numbers, credit card numbers, banks, names, addresses, telephone numbers, and any other identifying information;

g.   all records related to sources of obtaining any access device, as defined in 18 U.S.C. § 1029, or any means of identification, as defined in 18 U.S.C. § 1028;

17



       h.  all financial records of any type, including bank records, credit card records, statements, receipts, checks, bills, and account information.

   2.  Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted,  such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

   3.  Records evidencing the use of the Internet, including:

       a.  records of Internet Protocol addresses used;

       b.  records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

   As used above, the terms "records"  and "information" include all of the foregoing items of evidence in whatever form and by whatever  means  they  may have been created  or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

18



## ATTACHMENT A

### Property to Be Searched

The electronic device to be searched is a cellular telephone with the number (301) 768-

0340, subscribed to Gerald L. Moschel and currently being serviced by T-Mobile.



## ATTACHMENT B
### Particular Things to be Seized

1.  All records on the phones described in Attachment A that relate to violations of of 18 U.S.C. § 1028 (fraud and related activity in connection with identification documents, authentication features, and information), 18 U.S.C. § 1029 (fraud and related activity in connection with access devices), 18 U.S.C. § 1343 (wire fraud) and involved ISHMEL SESAY and any other co-conspirators, to include, but not limited to:

a.  All records and communications that relate to, further in any way, or constitute evidence of violations of the above listed statutes, including call records, text messages, pictures, video recordings, audio recordings, address book information, internet records, emails, notes, documents, and bookmarks;

b.  all records that have any tendency to establish the identity or location of co-conspirators;

c.  all records related to OLUBODE AKINBOLUSIRE's schedule or travel;

d.  all records related to the historical physical locations of the Device;

e.  all records related to financial transactions of any type, including credit card numbers, names, account numbers, routing numbers, amounts, dates, locations, addresses, receipts, communications, confirmations and any other identifying information;

f.  all access devices, as defined in 18 U.S.C. § 1029, all means of identification, as defined in 18 U.S.C. § 1028, and all related information including account numbers, credit card numbers, banks, names, addresses, telephone numbers, and any other identifying information;

g.  all records related to sources of obtaining any access device, as defined in 18 U.S.C. § 1029, or any means of identification, as defined in 18 U.S.C. § 1028;

17



      h. all financial records of any type, including bank records, credit card records, statements, receipts, checks, bills, and account information.

2. Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted,  such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3. Records evidencing the use of the Internet, including:

      a. records of Internet Protocol addresses used;

      b. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records"  and "information" include all of the foregoing items of evidence in whatever form and by whatever  means  they  may have been created  or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

18

